# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

ADAM EGGERS,

                Petitioner,            :     Case No. 3:14-cv-443

   - vs -                               District Judge Thomas M. Rose
                                         Magistrate Judge Michael R. Merz

WARDEN, Lebanon Correctional Institution,
                                     :

                Respondent.

# REPORT AND RECOMMENDATIONS

      This is a habeas corpus case brought pursuant to 28 U.S.C. § 2254. Petitioner Eggers, assisted by counsel, seeks relief from his sentence of life imprisonment upon conviction for felony murder in violation of Ohio Revised Code § 2903.02(B) in the Clark County Common Pleas Court. Eggers pleads the following grounds for relief:

> **Ground One:** The Ohio state courts entered decisions that were contrary to, or unreasonable applications of, the Supreme Court's clear precedent by failing to conclude on this record that Mr. Eggers entered his guilty plea unknowingly, unintelligently, or involuntarily.
>
> **Supporting Facts:** Brad Locher fired shots into a home containing men whom had threatened the lives of Mr. Eggers and Locher earlier that night. One shot resulted in the death of Mr. Eggers' former girlfriend. Charged with murder offenses for which he was innocent, Mr. Eggers wished to prepare for trial. His attorney promised to provide discovery, to move suppress both illegally-obtained statements of Mr. Eggers and DNA and GSR-test results. But the attorney challenged only one of the statements and then withdrew that motion. Mr. Eggers asked his attorney to interview witnesses that saw Locher with a gun earlier on the night of the shooting and heard Locher bragging about harming those that were in the home; but the attorney did not do so, and even

1

refused to read an affidavit presented from one of those potential exculpatory witnesses. The attorney did not prepare for trial and instead pressured Mr. Eggers and Mr. Eggers' close family, stating that Mr. Eggers had to plead guilty. Mr. Eggers appeared for a hearing in court, believing it was a suppression hearing and learned that the attorney had made a plea deal. The attorney reported that Mr. Eggers could not go to trial. Concerned that he would be wrongfully convicted and receive a life sentence because his attorney was not prepared for trial, Mr. Eggers entered a guilty plea, still noting his innocence in that same hearing, stating "You know I did not do this."

**Ground Two:** The Ohio state courts entered decisions that were contrary to, or unreasonable applications of, clear U.S. Supreme Court precedent by failing to conclude on this record that Mr. Eggers' trial counsel was prejudicially ineffective by leading Mr. Eggers to plead guilty in violation of his right to due process.

**Supporting Facts:** [Identical to Supporting Facts for Ground One.]

(Petition, Doc. No. 1). With Court permission Eggers filed a Brief in support (Doc. No. 4; Corrected Brief Doc. No. 14[1]) and on the Court's Order for Answer (Doc. No. 5), the Warden has filed the State Court Record (Doc. No. 8) and a Return of Writ (Doc. No. 9). With the filing of Eggers' Reply (Doc. No. 10), the case is ripe for decision.

**Procedural History**

In May 2010 four shots were fired into a residence at 926 Southfield Avenue in Springfield, Ohio; one of the shots struck Julie Snyder and killed her instantly. On January 24, 2011, the Clark County grand jury indicted Eggers on six counts: aggravated murder, two counts of felony murder, felonious assault, improper discharge of a firearm into a habitation, and

---

[1] The Brief was corrected to add PageID numbers to record citations.

improper handling of firearms in a motor vehicle. Later, Eggers was separately indicted on one count of having weapons while under disability.

On June 9, 2011, Eggers reached a plea agreement with the State under which he would plead guilty to felony murder as charged in Count Three of the indictment and the State would dismiss all other charges and firearm specifications for an agreed mandatory sentence of fifteen years to life (Plea of Guilty, Doc. No 8-1, PageID 75- 77.) Pursuant to the plea agreement, Eggers pled guilty and was sentenced the same day to the agreed sentence.

Eleven days later, on June 20, 2011, Eggers filed a *pro se* motion to withdraw his guilty plea on grounds he had been coerced into pleading and had received ineffective assistance of trial counsel (Doc. No. 8-1, PageID 80-81.) The trial court denied the motion and Eggers appealed. His first appointed counsel filed an *Anders* brief. The Second District Court of Appeals appointed new counsel and ordered briefing on the voluntariness of the plea (Decision and Entry, Doc. No. 8-1, PageID 188). After briefing by new counsel, the Second District affirmed the conviction. *State v. Eggers*, 2013-Ohio-3174, 2013 Ohio App. LEXIS 3237 (2nd Dist. Jul. 19, 2013)("Eggers DA"). The Ohio Supreme Court declined to exercise jurisdiction over a subsequent appeal. *State v. Eggers,* 137 Ohio St. 3d. 1440 (2013).

Eggers also filed a petition for post-conviction relief under Ohio Revised Code § 2953.21 alleging his plea was involuntary and he had received ineffective assistance of trial counsel (Petition, Doc. No. 8-1, PageID 317 *et seq.*) The trial court denied relief and the Second District affirmed shortly after it rendered judgment on the direct appeal. *State v. Eggers*, 2013-Ohio-3174, 2013 Ohio App. LEXIS 3456 (2nd Dist. Aug. 2, 2013)("Eggers PC"). The Supreme Court of Ohio also declined to exercise jurisdiction over an appeal of this judgment. *State v. Eggers,*

2013-Ohio-5285, 2013 Ohio LEXIS 2901 (Dec. 4, 2013).  Almost a year later Eggers filed the

instant Petition.

# Analysis

## Ground One:  Conviction Based on Unknowing, Unintelligent, or Involuntary Guilty Plea

In his First Ground for Relief, Eggers asserts his conviction is based on an unknowing,

unintelligent, or involuntary guilty plea.  He raised this claim as his First Assignment of Error on

direct appeal and the Second District Court of Appeals, in rejecting the claim, concluded "that

the trial court complied with Crim.R. 11 by informing Eggers of his rights and determining that

Eggers understood that a guilty plea waived those rights."  *State v. Eggers*, 2013-Ohio-3174, ¶ 1

1, 2013 Ohio App. LEXIS 3237 (2nd Dist. July 19, 2013)("Eggers DA").  The court's further

explanation of its decision is as follows:

> **[\*P7]**  At the plea hearing, counsel for the State explained the
> terms of the plea agreement. Tr. 3. The State then placed the
> pertinent facts on the record relating to the night that Julie Snyder
> was killed. *Id*. at 4-5. Eggers acknowledged that he understood the
> terms of the plea agreement, and said that he was not under the
> influence of drugs, alcohol, or medication. Eggers informed the
> trial court that he had signed the plea agreement after reviewing it
> with his attorney, and that he understood the agreement. Eggers
> stated that no one had threatened him to convince him to plead,
> and that he was pleading guilty voluntarily. The court then
> explained to Eggers the punishment for the offense of Felony
> Murder, and that Eggers was subject to a mandatory five years of
> post-release control. *Id*. at 5-8.
>
> **[\*P8]**  The trial court then engaged in the following colloquy with
> Eggers:

4

THE COURT: And do you understand that you do have the right to a trial in this case?

THE DEFENDANT: Yes, Your Honor.

THE COURT: At that trial you would have the right to require the State to prove beyond a reasonable doubt each and every element of the offense to which you are pleading guilty, and you could only be convicted upon the unanimous verdict of a jury. You would have the right to confront witnesses who would testify against you, and your attorney could cross-examine those witnesses. You would have the right to use the Court's subpoena power to compel the attendance of witnesses on your behalf, and you would also have the right to testify, but you could not be forced to do so. *Do you understand all of these rights*

THE DEFENDANT: *Yes, Your Honor.*

THE COURT: *By pleading guilty you would be giving up or waiving all of these rights that we have gone over. Understanding that at this time how did you wish to plead to the offense of murder in Count Three of the indictment*

THE DEFENDANT: *I'm sorry. Can you say that again*

THE COURT: *Sure. I just want to make sure that you do understand that upon entering a guilty plea in this case you would be waiving or giving up all of those rights that we have gone over*, the trial rights that you would have. The right to a trial, the right to the State proving their case beyond a reasonable doubt, the right whereby you could only be convicted upon the unanimous verdict of a jury, the right to confront witnesses who would testify against you, the right to have your attorney cross-examine those witnesses, the right to use the Court's subpoena power to compel the attendance of witnesses who would testify against you and also the right to testify if you choose to do so but you could not be forced to do so. *By pleading guilty you would be giving up or waiving those rights. Understanding that, how did you wish to plead to the offense of felony murder in Count Three of the indictment*

THE DEFENDANT: *Guilty, Your Honor.*

THE COURT: The Court finds that the defendant has knowingly, voluntarily, and intelligently waived his rights and entered a plea of guilty to that offense, and based upon that plea I find him guilty of that offense. *Id*. at 8-10 (Emphasis added.)

5

**[\*P9]**  Eggers contends that the trial court's explanation of his rights, and the fact that by pleading guilty he would waive these rights, was confusing, thereby rendering his guilty plea less than knowing, voluntary, and intelligent. According to Eggers, the trial court erred when it explained all of the rights at once, rather than one at a time, and when it failed to ask Eggers if he understood that a guilty plea would waive his rights. Based on our review of the particular facts of this case, we do not agree.

**[\*P10]**  Crim.R. 11(C)(2)(c) provides that the court may not accept a plea of guilty or no contest:

> without first addressing the defendant personally and . . .[i]nforming the defendant and determining that the defendant understands that by the plea the defendant is waiving the rights to jury trial, to have compulsory process for obtaining witnesses in the defendant's favor, and to require the state to prove the defendant's guilt beyond a reasonable doubt at trial at which the defendant cannot be compelled to testify against himself or herself.

**[\*P11]**  A guilty plea is constitutionally infirm when the defendant is not informed in a reasonable manner that his plea waives those rights. *State v. Ballard*, 66 Ohio St.2d 473, 423 N.E. 2d 115 (1981).

**[\*P12]**  In *Ballard*, the Ohio Supreme Court described how a trial court must explain a defendant's rights under Crim. R. 11, stating, at paragraphs one and two of the syllabus:

> 1. Prior to accepting a guilty plea from a criminal defendant, the trial court must inform the defendant that he is waiving his privilege against compulsory self-incrimination, his right to jury trial, his right to confront his accusers, and his right of compulsory process of witnesses. (*Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274, followed.)

> 2. Failure to use the exact language contained in Crim.R. 11(C), in informing a criminal defendant of his constitutional right to a trial and the constitutional rights related to such trial, including the right to trial by jury, is not grounds for vacating a plea as long as the record shows that the trial court explained these rights in a

manner reasonably intelligible to that defendant. (*State v. Caudill*, 48 Ohio St.2d 342, 358 N.E.2d 601, modified.)

[**\*P13**] In *State v. Thomas*, 116 Ohio App.3d 530, 534, 688 N.E.2d 602 (2d Dist.1996), we expounded on the Supreme Court's statement regarding Crim. R. 11 and the exchange that the trial court is required to have with a defendant prior to accepting his guilty plea:

> The purpose of the procedure required by [Crim.] R. 11(C) is to ensure that the defendant subjectively understands each of the rights concerned and that he waives it by his plea of guilty or no contest. That proposition must be demonstrated by the record. The preferred method is to use the language contained in the rule, stopping after each right and asking whether the defendant understands that right and knows that his plea waives it. *Id*. When that is not done, the record must, in some other way, affirmatively demonstrate the propositions made necessary by the rule.

[**\*P14**] In short, "a trial court can still convey the requisite information on constitutional rights to the defendant even when the court does not provide a word-for-word recitation of the criminal rule, so long as the trial court actually explains the rights to the defendant." *State v. Veney*, 120 Ohio St.3d 176, 2008-Ohio-5200, 897 N.E.2d 621, ¶ 27.

[**\*P15**] The trial court explained each of Eggers's rights to him. After doing so, Eggers stated that he understood these rights. Tr. 8-9. The trial court then explained that by pleading guilty, Eggers would be waiving those rights, once again stating each of Eggers's rights. The court then stated, "By pleading guilty you would be giving up or waiving all of these rights that we have gone over. Understanding that at this time how did you wish to plead to the offense of murder in Count Three of the indictment?" Eggers then stated "I'm sorry. Can you say that again?" The trial court then once again explained all of Eggers's rights and that a guilty plea would mean that Eggers is waiving all of these rights. The court concluded by once again asking, "Understanding that, how did you wish to plead to the offense of felony murder in Count Three of the indictment?" This time, Eggers responded that he was pleading guilty.

[**\*P16**] Eggers contends that the trial court erred by failing to ask Eggers if he understood that a guilty plea would waive his

7

rights. The trial court did ask this question, albeit in an imperfect way. The trial court asked, "Understanding that, how did you wish to plead to the offense of felony murder in Count Three of the indictment?" This question essentially asked, "Assuming you understand that a guilty plea waives these rights, how do you wish to plead?" By answering "guilty," Eggers implied that he understood that a guilty plea would waive his rights and that he was pleading guilty. While we agree that the better practice would have been to stop after the explanation of each right and ask whether Eggers understood the right and that a guilty plea waived the right, we conclude the trial court's three explanations of Eggers's rights, Eggers's confirmation that he understood the rights, and the trial court's two explanations to Eggers that a guilty plea would waive the rights, were sufficient to establish that Eggers's guilty plea was knowing, intelligent, and voluntary. Eggers also stated that he understood what was contained on the written plea form that he signed voluntarily. His rights and the consequences of a guilty plea were explained on this form. Based upon the entire plea colloquy, we conclude that the trial court could reasonably determine, as required by Crim.R. 11(C)(2)(c), that Eggers understood both his rights and the consequences of his guilty plea.

**[\*P17]** Eggers also contends that the trial court failed to comply with Crim.R. 11 when the court addressed the fact that Eggers "cannot be compelled to testify against himself or herself." Crim.R. 11(C)(2)(c). The trial court did not use the language of Crim.R. 11(C), instead stating, "You would have the right to use the Court's subpoena power to compel the attendance of witnesses on your behalf, and you would also have the right to testify, but you could not be forced to do so." Tr. 8-9. The Supreme Court has expressed a preference that the trial court use the language employed in Crim.R. 11 when explaining a defendant's rights to him during a plea colloquy. But the Supreme Court has also made it clear that the failure to employ the language in Crim.R. 11 is not fatal to a guilty plea. Indeed, the Supreme Court has noted that "[t]he use of common, everyday words, * * * instead of a rote recitation of legal terminology, can assist the defendant in understanding the rights forfeited by entry of a plea." *State v. Barker*, 129 Ohio St.3d 472, 2011-Ohio-4130, 953 N.E.2d 826, ¶ 20.

**[\*P18]** The trial court explained Eggers's right to not be compelled to testify against himself in common, everyday words. Based on our review of the particular facts before us, we conclude that the trial court did not err in doing so.

8

*Id.*

Eggers contends the Second District's decision on direct appeal is either contrary to or an objectively unreasonable application of clearly established Supreme Court precedent and based its decision on an unreasonable determination of the facts in light of the evidence presented (Corrected Brief, Doc. No. 14, PageID 889-91.)

A plea of guilty or no contest is valid if it is entered voluntarily and intelligently, as determined by the totality of the circumstances. *Brady v. United States,* 397 U.S. 742, 748 (1970); *Boykin v. Alabama*, 395 U.S. 238, 242-44 (1969); *King v. Dutton*, 17 F.3d 151 (6th Cir. 1994); *Riggins v. McMackin*, 935 F.2d 790, 795 (6th Cir. 1991); *Berry v. Mintzes,* 726 F.2d 1142, 1146 (6th Cir. 1984). The determination of whether this plea was intelligently made depends upon the particular facts and circumstances of each case. *Johnson v. Zerbst,* 304 U.S. 458, 463 (1938); *Garcia v. Johnson*, 991 F.2d 324, 326 (6th Cir. 1993).

> A plea of guilty entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e. g. bribes).

*Brady v. United States*, 397 U.S. 742, 755 (1970). In order for a guilty plea to be constitutional it must be knowing, intelligent, voluntary, and done with sufficient awareness of the relevant circumstances and likely consequences. *Bradshaw v. Stumpf*, 545 U.S. 175, 183 (2005).

A plea-proceeding transcript which suggests that a guilty or no contest plea was made voluntarily and knowingly creates a "heavy burden" for a petitioner seeking to overturn his plea. *Garcia v. Johnson*, 991 F.2d 324, 326–28 (6th Cir. 1993). Where the transcript shows that the

guilty or no contest plea was voluntary and intelligent, a presumption of correctness attaches to the state court findings of fact and to the judgment itself. *Id.* at 326–27.

By entering a plea of guilty, the accused is not simply stating that he did the discrete acts described in the indictment; he is admitting guilt of a substantive crime. *United States v. Broce*, 488 U.S. 563, 570 (1989); *McCarthy v. United States*, 394 U.S. 459, 466 (1969).

Where a trial court has scrupulously followed the required procedure under Fed. R. Crim. P. 11, "the defendant is bound by his statements in response to that court's inquiry." *Baker v. United States*, 781 F.2d 85, 90 (6th Cir. 1986), *quoting Moore v. Estelle*, 526 F.2d 690 (5th Cir. 1976).

A state court finding that the plea was proper is accorded a presumption of correctness, unless the transcript of the plea proceeding is inadequate to demonstrate that the plea was voluntary, intelligent and knowing. *Stumpff v. Mitchell,* 372 F.3d 821 (6th Cir. 2004), *citing Garcia v. Johnson*, 991 F.2d 324, 326 (6th Cir. 1993); *Dunn v. Simmons*, 877 F.2d 1275, 1277 (6th Cir. 1989), *overruled on other grounds by Parke v. Raley*, 506 U.S. 20 (1992).

The factual findings of a state court that a plea was proper generally are generally presumed to be correct. *Dunn v. Simmons*, 877 F.2d 1275 (6th Cir. 1989), overruled on other grounds by *Parke v. Raley,* 506 U.S. 20 (1992). Whether a guilty or no contest plea is or is not voluntary is a mixed question of fact and law, but state court historical factual findings underlying the determination are entitled to a presumption of correctness under 28 U.S.C. § 2254(d). *Parke v. Raley*, 506 U.S. 20 (1992).

Much of the evidence on which Eggers relies for his claim that the Second District unreasonably determined the facts is evidence submitted with his post-conviction petition. (See Corrected Brief, Doc. No. 14, PageID 890-93, footnotes 1, 7, 8, 9, 14, 15.) His counsel

emphasizes "Mr. Eggers' entire post-conviction petition was a notarized sworn statement.  Mr. Eggers swore to the truth of the statements of facts." *Id.* at n. 1, citing Doc. No. 8-1, PageID 384.  At that point, Eggers swears that he has personal knowledge of the facts asserted in the Petition and that all the facts, the evidence attached, and even the legal arguments made are "wholly correct and true."

Eggers cannot rely on the evidentiary material associated with the post-conviction petition to show the Second District made an "unreasonable determination of the facts in light of the evidence presented" because the Petition with its attachments was not before the appellate court on direct appeal.  28 U.S.C. § 2254(d)(2) does not apply to all the possible evidence which could be presented, but only to the evidence actually presented.  The only evidence before the Second District on direct appeal was the transcript of the plea proceeding and the associated documents.

Eggers filed his first attack on his guilty plea on June 20, 2011 (Motion to Withdraw Plea of Guilt, Doc. No. 8-1, PageID 80 et seq.)  As grounds for withdrawal, he stated "I am actually and truely [sic] innocent of any & all charges of murder or any of the lesser included offenses." He then asserts he was denied his constitutional rights to a fair trial by jury, his right to appeal any conviction, and his right to testify on his own behalf as to his actual innocence in violation of his Fourth, Sixth, Eighth, and Fourteenth Amendment rights through duress, coercion, and the "ineffectual assistance of council." *Id.* at PageID 80-81.  All of these allegations are completely conclusory.  That is, he does not say what coercion or duress was applied to him.  He does not suggest what rights he did not understand he was waiving by pleading guilty.  Most importantly, he recites several times the words "actual innocence," but gives no indication of what his testimony would be or how he would overcome the State's case.  In opposing the Motion to

Withdraw, the prosecutor noted that Eggers had supported his motion with no evidence either in the record or by affidavit (Response, Doc. No. 8-1, PageID 84.)

On appeal, then, the Second District had the plea colloquy transcript and the written plea agreement as evidence on whether the guilty plea was  knowing, intelligent, and voluntary.  In the written plea agreement, all of the rights associated with trial are enumerated and Eggers acknowledges that he understands them and that he is giving them up by pleading guilty (Doc. No. 8-1, PageID 76).  The plea agreement also says

> By pleading guilty I admit committing the offense and will tell the Court the facts and circumstances of my guilt. I further agree that my admission to the facts as placed on record shall be irrevocable and admissible in any further proceedings in this case, regardless of whether this plea is revoked or this case is appealed by me. I know the judge may either sentence me today or refer my case for a presentence report.

*Id.*

In the plea colloquy, Judge Rastatter again orally recites the rights associated with trial and the fact that they are being waived or given up by a guilty plea (Transcript, Doc. No. 8-1, PageID 138-39).  He had previously asked Eggers if he had gone over the written plea agreement with his lawyer and understood everything in it. *Id.*  at PageID 138.  The judge noted that the case had been set for a motion to suppress hearing at that time but inquired whether a plea agreement had been reached and whether Eggers wanted to go forward with the plea hearing that afternoon. *Id.*  The judge informed Eggers that the only possible sentence for the crime to which he was pleading guilty was life in prison with parole eligibility after fifteen years and Eggers said he understood the mandatory sentence. *Id.*

Nothing in the record before the court of appeals shows the plea was not knowing and intelligent.  Both orally and in writing, Eggers was told the trial rights he had and that he would

be giving them up by pleading guilty.  He was told the sentence he would receive and that it could happen at the same proceeding.  He was told what he was getting for his guilty plea – dismissal of all other charges, including aggravated murder which carries a substantially more severe sentence.  He repeatedly said, both in writing and orally, that he understood what he was being told and being offered.

Before the Second District, Eggers argued the oral explanation of rights was "confusing" because they were grouped together and not discussed one at a time.  *State v. Eggers DA, supra,* ¶ 9.  Discussing the purpose of Ohio R. Crim. P. 11, Judge Fain cited his own court's prior precedent:

> The purpose of the procedure required by [Crim.] R. 11(C) is to ensure that the defendant subjectively understands each of the rights concerned and that he waives it by his plea of guilty or no contest. That proposition must be demonstrated by the record. The preferred method is to use the language contained in the rule, stopping after each right and asking whether the defendant understands that right and knows that his plea waives it. *Id*. When that is not done, the record must, in some other way, affirmatively demonstrate the propositions made necessary by the rule.

*Id.* at ¶ 13, citing *State v. Thomas,* 116 Ohio App. 3d 530, 534 (2nd Dist. 1996).  While the trial judge did not follow the Second District's "preferred method," Eggers here cites no United States Supreme Court authority holding that a method such as the Second District's preferred method is constitutionally required.  To put the matter another way, while Judge Rastatter's summary recitation of rights might be "confusing" to some, there is no evidence in the record that it was ultimately confusing to Eggers.  Indeed, when he asked the judge to repeat, that is exactly what the judge did.  Eggers never protested that he did not understand, even when he filed his Motion to Withdraw.

There was even less evidence before Judge Rastatter or the Second District that the plea

13

was involuntary. The judge inquired if Eggers was under the influence of any substances which might have affected his will and he answered that he was not. (Transcript, Doc. No. 8-1, PageID 138). He never protested that he was being forced or threatened. Although he blamed the plea on ineffective assistance of counsel when he sought to withdraw it, he said nothing of the kind at the plea hearing.

The Second District's decision in *Thomas* has the matter exactly correct – did the pleading defendant subjectively understand his rights? A plea colloquy is not like a religious ritual which is said to be effective if all the right words are said in the right order, regardless of the effect on persons in the congregation. Rather, the question is the effect of the words, both written and oral, on the subjective understanding of the defendant. To find out whether the defendant subjectively understands, he is asked if he understands. He will not be heard to say that he had his fingers crossed, that he "really" did not understand when he said, repeatedly, that he did understand. The law has no means to look into a person's mind and determine directly what he knows. When he says he knows, a court is entitled to rely on that admission.

The constitutional rights associated with a criminal prosecution are of course dense. The standard law school course to teach them lasts a semester and a leading text for that course, Principles of Criminal Procedure: Post-Investigation,[2] is over 800 pages long. Students study that law at leisure and hopefully understand those rights at the end of the course. Criminal defendants, on the other hand, are confronted with the need to appreciate those rights in a very emotional setting which often will have grave consequences for their lives. But we are not prepared as a society to eliminate plea bargaining or turn the plea colloquy into an extended criminal law seminar.

The conclusion of the Ohio courts that Eggers' plea was knowing, intelligent, and voluntary

---

[2] Principles of Criminal Procedure: Post-Investigation, LaFave, Israel, King & Kerr (West Publishing, 2009).

is neither an unreasonable determination on the basis of the evidence nor an objectively unreasonable application of Supreme Court precedent.

Eggers also complained on direct appeal that, because he had protested his innocence when pleading guilty, the trial court should have followed the procedure prescribed *in North Carolina v. Alford,* 400 U.S. 25 (1970). Judge Fain's opinion deals with this claim as follows:

> **[\*P19]** Eggers finally argues that the trial court erred by not inquiring whether Eggers's plea of guilty was one that should have been done pursuant to *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970). Brief, p. 9-10. Eggers's reliance on *Alford* is misplaced.
>
> **[\*P20]** In *Alford*, the United States Supreme Court found that a guilty plea coupled with a claim of innocence should not be accepted unless there is a factual basis for the plea and the trial court inquires into and resolves the apparent conflict between the waiver of trial and claim of innocence. *Id.* at 37. However, '[i]mplicit in any *Alford* plea is the requirement [that] a defendant actually state his innocence on the record when entering a guilty plea.'" *State v. Knowles*, 8th Dist. Cuyahoga No. 95239, 2011-Ohio-1685, ¶ 20 (Citations omitted.) The record before us discloses no protestations of innocence when the trial court accepted Eggers's guilty plea.
>
> **[\*P21]** The only statements in the record that could be construed as a protestation of innocence occurred after the guilty plea had been accepted. The trial court then proceeded to sentencing and asked Eggers if he had anything else to say, thus giving Eggers the chance to exercise his right to allocution. Tr. 10-11. At that time, Eggers stated, for the first time, "I'd like to apologize to the family. You know I loved her. You know I didn't do this. I didn't do this. I love you, mom. I don't know. That's it. I don't know what else to say." *Id*. at 11.
>
> **[\*P22]** Eggers waited until sentencing to make any statement regarding innocence. Therefore, *Alford* does not apply, and the trial court had no duty during the plea hearing to inquire whether Eggers's plea of guilty was one that should have been done pursuant to *Alford*.

*State v. Eggers DA, supra.*

Eggers accuses the Second District of "making an artificial distinction between the 'plea' portion of the hearing and the 'sentencing' portion of the hearing."  (Reply Brief, Doc. No. 10, PageID 865).  He notes that his statement that he didn't do it "was just two minutes (at most) after he pleaded guilty."  *Id.*  The fact that the asserted protestation of innocence took place shortly after the plea does not make the distinction "artificial."  Conceptually, the plea of guilty with the required colloquy is distinct from the defendant's right of allocution, even if they happened during the same court session.  Eggers' counsel points to no law requiring the state courts to conflate the analysis of those two proceedings just because they happen back-to-back in a particular case.  And it is certainly true that Eggers did not protest his innocence in the course of changing his plea.

The second question is whether Eggers did protest his innocence during his allocution. What he did was to make an apology "to the family" and proclaim that "he loved her," referring to the victim.  The context of the killing was that Eggers fired four shots into the residence of Daniel Bryant with whom he was contesting the affections of the victim, Julie Snyder.  Instead of killing Bryant, he killed Snyder.  Given that his words were spoken in the midst of an apology, they could have been understood as directed to her family and claiming he did not intend to kill her.  As the Second District concluded, it requires "construction" to find these words are a protestation of innocence.

Certainly Eggers added nothing of substance to his protestation of innocence with his Motion to Withdraw where he incants the legalistic phrase "actual innocence" three times, but never puts any meat on the bones of that assertion.

Lastly, of course, the record does contain a statement of facts underlying the conviction.

16

> The facts that support Count Three of the indictment are that in the week leading up to May 16, 2010, this defendant, Adam Eggers, had been involved in a feud with a guy named Dustin Bryant and another guy named Joey Tackett.
>
> Around 12:30 on the morning of May 16, 2010, the defendant went outside of the – to the residence at 926 Southfield Avenue here in the City of Springfield, Clark County, Ohio, and stayed outside of that residence and fired four shots into that habitation.
>
> One of those shots went through a wall into the habitation and struck Julie Snyder sitting in a chair that was up against that wall. The shot went [   ]³ killed her instantly.

(Plea Transcript, Doc. No. 8-1, PageID 137-38.) Thus a factual basis was placed of record to support the finding of a factual basis for the conviction. That satisfies the factual basis requirement of *Alford* or at least concluding so would not be an objectively unreasonable application of *Alford*.

Eggers' First Ground for Relief should be dismissed with prejudice.


**Ground Two:  Ineffective Assistance of Trial Counsel**


In his Second Ground for Relief, Eggers argues he received ineffective assistance of trial counsel when his attorney persuaded him to plead guilty.

Ohio has a bifurcated process for raising claims of ineffective assistance of trial counsel. If the claim depends on evidence of record on direct appeal, the ineffective assistance must be litigated in that proceeding or be barred from later litigation by Ohio's criminal *res judicata* doctrine. *State v. Perry*, 10 Ohio St. 2d 175 (1967). Eggers raised no claims of ineffective assistance of trial counsel on direct appeal. Therefore he was barred from raising in post-conviction any claims that could have been presented on direct appeal.

---

³ Line 25 is missing from the copy of this page of the transcript filed with the Court.  PageID 137.

In his Corrected Brief, Eggers asserts

> The attorney did not object when the trial court failed to question whether Mr. Eggers knew he was waiving his trial rights or when Mr. Eggers asserted his innocence after pleading guilty but the trial court did not stop and reverse course to question whether it could accept the guilty plea.

(Doc. No. 14, PageID 891, footnotes omitted).

These facts are evident on the face of the record but were not raised as claims of ineffective assistance of trial counsel on direct appeal and are therefore barred by *res judicata.* The *Perry* doctrine has been repeatedly held to be an adequate and independent state ground of decision. *Durr v. Mitchell*, 487 F.3d 423, 432 (6th Cir. 2007); *Buell v. Mitchell*, 274 F.3d 337 (6th Cir. 2001); *Coleman v. Mitchell*, 268 F.3d 417 (6th Cir. 2001); *Byrd v. Collins,* 209 F.3d 486, 521-22 (6th Cir. 2000); *Rust v. Zent*, 17 F.3d 155, 160-61 (6th Cir. 1994)(citation omitted); *Van Hook v. Anderson,* 127 F. Supp. 2d 899, 913 (S.D. Ohio 2001).

Eggers did, however, raise extensive claims of ineffective assistance of trial counsel based on evidence outside the direct appeal record in his petition for post-conviction relief.  He asserts "[t]he attorney admitted not being prepared for trial, had worked to negotiate a plea without Mr. Eggers' knowledge or consent, and stated that Mr. Eggers had no choice but to plead guilty."  (Corrected Brief, Doc. No. 14, PageID 891).   Further along in his Corrected Brief, he makes additional ineffective assistance allegations:

> Mr. Eggers made clear to his counsel, Adam Nemann, that he was innocent and that the case would need to go to trial. Having paid Mr. Nemann $25,000 up front for the case and the trial (and ultimately paying more than $29,000), Mr. Eggers expected to go to trial. Mr. Eggers was not expecting to pay that amount and plead guilty. He spoke to Mr. Nemann about steps needed to prepare for trial. The attorney promised to obtain discovery documents and share them with Mr. Eggers, to move to suppress the illegally-obtained portions of two police interviews of Mr. Eggers, and to

18

challenge the gun residue test. But the attorney did not do so, even as trial approached. Mr. Eggers asked the attorney to interview key witnesses that were able to help demonstrate that Brad Locher had possessed a gun that day and filed the shots into the home, including the one that killed Ms. Snyder. As the trial approached, the attorney admitted that, while he "could" be ready for trial, he was not ready.

In early June 2011, Mr. Nemann filed a motion to suppress Mr. Eggers' statements to police during the January 14, 2011 interview. Despite Mr. Eggers' requests, the attorney did not move to suppress Mr. Eggers' initial statements in May 2010 or seek to challenge the GSR tests.

Three days later, Mr. Eggers appeared before the trial court for what he and his close family members believed was going to be an arraignment on a new charge (felon in possession of a weapon) to which Mr. Eggers was expected to plead not guilty, and a suppression hearing on the recently-filed motion.30 But Mr. Eggers and his family learned that the attorney had reached a plea deal.31 The attorney told Mr. Eggers that, if he went to trial, he would be convicted and sentenced to life and that Mr. Eggers did not have a real option to proceed to trial.32 In short, the attorney gave Mr. Eggers no choice and essentially demanded that he plead guilty. Feeling that he could not win a trial where his counsel would not fight for him, Mr. Eggers capitulated and pleaded guilty to Felony Murder, without the firearm specification, in exchange for dismissal of all other charges.

*Id.* at PageID 896-97 (footnotes omitted).

Eggers presented his claims of ineffective assistance of trial counsel to the Second

District on appeal from denial of his post-conviction petition. That court held as follows:

[\*P12] Eggers contends in these six assignments of error that the 42 exhibits attached to his petition for post-conviction relief establish that he received ineffective assistance of trial counsel and that he was coerced into entering his guilty plea. According to Eggers, these exhibits demonstrate that his counsel provided ineffective assistance in the following ways: failing to move to suppress the gun-shot-residue test and the statements he made to the police; failing to interview vital witnesses; failing to have Brad Locher undergo a second polygraph examination; and giving his mother bad advice regarding whether Eggers should agree to the plea deal offered by the State. Eggers contends that these exhibits

are sufficient to demonstrate ineffective assistance of trial counsel or, at a minimum, are sufficient to require the trial court to hold an evidentiary hearing prior to overruling his petition for post-conviction relief. We do not agree.

**A. Eggers Had the Burden of Submitting Evidentiary Documents Containing Sufficient Operative Facts to Demonstrate the Lack of Competent Counsel and that the Defense Was Prejudiced by Counsel's Ineffectiveness**

**[\*P13]** [Text of Ohio Revised Code § 2953.21 omitted.]

**[\*P14]** An appellate court reviews a trial court's decision granting or denying a post-conviction petition under R.C. 2953.21 under an abuse of discretion standard. *State v. Gondor, 112 Ohio St.3d 377, 2006 Ohio 6679, 860 N.E.2d 77, ¶ 58.* The term "abuse of discretion" has been defined as a decision that is unreasonable, arbitrary, or unconscionable. *Huffman v. Hair Surgeon, Inc., 19 Ohio St.3d 83, 87, 19 Ohio B. 123, 482 N.E.2d 1248 (1985).*

**[\*P15]** [I]n a petition for post-conviction relief, which asserts ineffective assistance of counsel, the petitioner bears the initial burden to submit evidentiary documents containing sufficient operative facts to demonstrate the lack of competent counsel and that the defense was prejudiced by counsel's ineffectiveness." *State v. Jackson, 64 Ohio St.2d 107, 111, 413 N.E.2d 819 (1980).*

**[\*P16]** A hearing is not automatically required whenever a petition for post-conviction relief is filed. The test is whether there are substantive grounds for relief that would warrant a hearing based upon the petition, the supporting affidavits and the files and records in the case." *State v. Strutton, 62 Ohio App.3d 248, 251, 575 N.E.2d 466 (2d Dist.1988),* citing *State v. Jackson, 64 Ohio St.2d 107, 110, 413 N.E.2d 819 (1980).* A court may overrule the petition "without a hearing when the record, including the dialogue conducted between the court and the defendant pursuant to Crim. R. 11, indicates that the petitioner is not entitled to relief and that the petitioner failed to submit evidentiary documents containing sufficient operative facts to demonstrate that the guilty plea was coerced or induced by false promises." *State v. Kapper, 5 Ohio St. 3d 36, 38, 5 Ohio B. 94, 448 N.E.2d 823 (1983).*

**B. The Affidavits Submitted with Eggers's Petition Do Not Contain Sufficient Operative Facts to Establish Ineffective Assistance of Counsel**

**[*P17]** Affidavits may be submitted in support of post-conviction relief motions. R.C. 2953.21. "However, not all affidavits accompanying a postconviction relief petition demonstrate entitlement to an evidentiary hearing, even assuming the truthfulness of their contents." *State v. Calhoun*, 86 Ohio St.3d 279, 284, 1999 Ohio 102, 714 N.E.2d 905 (1999). "[W]here a petitioner relies upon affidavit testimony as the basis of entitlement to postconviction relief, and the information in the affidavit, even if true, does not rise to the level of demonstrating a constitutional violation, then the actual truth or falsity of the affidavit is inconsequential." *Id.*

**[*P18]** The evidentiary documents submitted with Eggers's petition include six sworn affidavits by friends and family of Eggers. Exhibit 11 to Eggers's petition for post-conviction relief is an affidavit from a personal friend of Eggers, Joseph Dugan. The affidavit states, in pertinent part:

> On the night of May 15, 2010, I walked up to [Eggers's] car, Brad [Locher] was in the passenger seat. He was the only one in the car. He was handling a small semi-auto handgun. I asked him "What the hell are you doing?" He said not to worry, it was not loaded. I told him he was stupid and to put the gun away. I walked away at that point, got in my truck and left.

> * * * I feel from Brad's response to me asking him "what the hell are you doing" and his response being "not to worry, it was not loaded" is as if Brad was in possession/control of the gun he was handling.

**[*P19]** Eggers contends throughout his petition for post-conviction relief and his appellate brief that Brad Locher is a liar who framed Eggers for the murder of Snyder. However, assuming the truthfulness of the averments in Dugan's affidavit, at most the affidavit establishes that Locher had a gun in his hands at some point during the evening that Julie Snyder was murdered. We conclude that Dugan's affidavit does not contain sufficient operative facts to demonstrate the lack of competent counsel and that the defense was prejudiced by counsel's ineffectiveness, or that Eggers's guilty plea was coerced or less than knowingly, voluntarily, and intelligently made.

**[*P20]** Exhibit 23 to Eggers's petition is a February 15, 2012 affidavit of Robert Buck, Eggers's stepfather. Buck averred that Eggers's trial counsel, Adam Nemann, was initially paid $6,000 as

a retainer fee on January 17, 2011, and Nemann visited Eggers in jail on that same day. In the latter portion of January 2011, Nemann was paid another $14,000 by Eggers's family. Buck avers that this additional payment was made despite the fact that "Mr. Nemann had done nothing to this date in Adams [sic] defense." Buck also averred that he and his wife met with and were interviewed by Nemann in February 2011. According to Buck, Nemann explained to him that Brad Locher had stated to police that Eggers had committed the murder and that Buck had assisted in hiding the murder weapon.\

[*P21] Buck's affidavit consists primarily of general allegations of deficiencies in Nemann's representation of Eggers and some contradictory statements regarding this representation. Furthermore, although Buck averred that Nemann "had done nothing to this date" in the defense of Eggers, the date referred to by Buck was only a couple of weeks into Nemann's representation of Eggers. Indeed, Buck stated in his affidavit that Nemann had visited Eggers in jail on January 17, 2011, and interviewed Buck and his wife in early February 2011.

[*P22] Assuming the truthfulness of the averments in Buck's affidavit, we conclude that the affidavit does not contain sufficient operative facts to demonstrate the lack of competent counsel and that the defense was prejudiced by counsel's ineffectiveness, or that Eggers's guilty plea was coerced or less than knowingly, voluntarily, and intelligently made.

[*P23] Attached as Exhibits 16, 24, and 36 to Eggers's petition are three affidavits of Paula Buck, Eggers's mother. In Exhibit 16, Ms. Buck described the events as she recalled them from the evening of May 15, 2010. She explained that she heard her son's car pull up into her garage after midnight and she then heard Eggers and Brad Locher arguing. Eggers informed her that Julie Snyder had been in a shooting. Eggers and Locher then left the house, and Ms. Buck subsequently left the house to go purchase cigarettes at a gas station. On her way there, she saw that the police had pulled over the vehicle in which Eggers was riding. The police subsequently obtained a search warrant to search Ms. Buck's residence, and Eggers was identified as a suspect in the murder of Snyder and taken to the police station for questioning.

[*P24] In Exhibit 24, Ms. Buck addressed the retention of Adam Nemann as Eggers's trial counsel. Nemann visited Eggers in jail on the same day that Ms. Buck retained him as trial counsel. According to Ms. Buck, on February 2, 2011, she and her husband

drove to Nemann's office to be interviewed. During this interview, Ms. Buck was provided with several police interviews of Brad Locher. Ms. Buck stated that she could refute all of Locher's lies about her and her son. Nemann explained to Ms. Buck that he was aware of Locher's chronic lying and that he planned to have Locher undergo another polygraph test, despite the fact that Locher had already passed a polygraph. According to Ms. Buck, Nemann also alerted her that Eggers's gun shot residue test came back positive for gun-shot residue, but that Nemann "would file the appropriate motion attacking the test and its results." Nemann also requested another $10,000 to hire an independent investigator.

 [*P25]  In her third and final affidavit, Exhibit 36, Ms. Buck described her interactions with Nemann leading up to her son's guilty plea. According to Ms. Buck, Nemann consistently claimed that the case would proceed to trial and that he was filing the proper motions in defense of Eggers. Ms. Buck stated that she had "many interactions" with Nemann over the phone and in person. However, she averred that it eventually became more difficult to get in contact with Nemann. On June 1, 2011, Nemann visited Eggers in jail. Nemann subsequently called Ms. Buck and told her that he had recently reviewed new evidence that showed Eggers's guilt in the death of Julie Snyder. Nemann told Ms. Buck that he had worked out a plea with the State and that he wanted her  help in talking to Eggers about accepting the plea deal. Ms. Buck then stated that:

> Mr. Nemann told me that he could get [Eggers] a 15 year to life sentence with an early parole and if Adam did not take this plea and lost at trial that Judge Rastatter has made it clear that he (Rastatter) would give my son the maximum sentence and Mr. Nemann told me how corrupt and bad Judge Rastatter was and that Adam had to take the plea, and for me not to forget the New Indictment, which was bad too.

[*P26]  On June 9, 2011, Ms. Buck asked Nemann in person about the new evidence that led to his advice that Eggers take the plea deal. According to Ms. Buck:

> Mr. Nemann said that he spoke to B.C.I. and had found out the G.S.R. Test was administered properly and the Polygraph administered to Locher was performed adequately and Locher was quetioned [sic] properly and that Locher's latest police interview incriminated [Eggers] and my Husband and it may lead to other arrest and that

he had the investigator question Nicole Bowers and David Hall Jr. and both retracted their statements and was refusing to come to trial against [Locher].

[*P27]  When Eggers arrived at the courtroom on June 9th, Nemann explained to Eggers the evidence against him and urged Eggers to take the plea deal. Ms. Buck also told Eggers to take the plea deal. Ms. Buck concluded her affidavit by stating that Nemann had deceived her and her son and had essentially played on her love for her son to steal $25,000 from her in attorney fees.

[*P28]  Eggers contends that the affidavits of Ms. Buck demonstrate that he received ineffective assistance of trial counsel and was coerced into entering a guilty plea. For example, Eggers points out that his counsel failed to file a motion to suppress the statements he made to the police and the results of a gun-shot-residue test. However, Eggers's counsel did in fact file a motion to suppress the statements Eggers made to the police. Dkt. 18. Furthermore, Eggers has not submitted any evidence that a motion to suppress the gun-shot residue test would likely have been successful. Also, it could have been trial strategy for Eggers's trial counsel to wait to challenge the findings on cross-examination at trial. Of course, Eggers's decision to plead guilty prevented a trial from taking place.

[*P29]  Eggers also points to the allegations in Ms. Buck's affidavits that trial counsel had informed Eggers and herself that the trial judge was corrupt and that Eggers would lose at trial and receive a maximum sentence. A lawyer's sincere assessment of the likely outcome of a defendant's decision to reject a plea offer and go to trial does not constitute ineffective assistance of counsel unless it is so clearly unwarranted that no reasonable attorney would offer that assessment. There is no evidence here that Nemann's assessment was either insincere or unwarranted.

[*P3O]  Furthermore, let us assume, for purposes of analysis, that Nemann actually made the comment about the trial judge that Ms. Buck attributes to him. Although a lawyer may have contrasting duties as an officer of the court, the lawyer's duty to his client is not breached when the lawyer offers his sincere opinion concerning the character of the trial judge, even when that opinion is an unflattering one.

[*P31]  Assuming the truthfulness of the contents of Ms. Buck's affidavits, we conclude that the affidavits do not contain sufficient operative facts to demonstrate the lack of competent counsel and

24

that the defense was prejudiced by counsel's ineffectiveness or that Eggers's guilty plea was coerced or less than knowingly, voluntarily, and intelligently made.

[*P32]  Attached as Exhibit 37 to Eggers's petition is an affidavit of Melissa Dugan, a close friend of Eggers and his family. Dugan avers that she has worked in the legal field in Clark County since 1989. Dugan accompanied Eggers's mother to Eggers's arraignment on January 27, 2011. At the arraignment, Dugan offered her assistance to Eggers's trial counsel. Nemann subsequently contacted Dugan and asked her to copy documents out of Eggers's court case files and fax them to him, which she did. On June 3, 2011, Dugan received information from her husband about the night of the murder that she believed could prove to be beneficial to Eggers. She presented this information to Nemann, but Dugan did not identify in her affidavit what this information was. Dugan believed that Nemann did not give Eggers the necessary priority and opined that Nemann should have conducted additional discovery and filed additional motions.

[*P33]  Dugan does not aver that she has personal knowledge of all the work performed by Nemann in preparation for Eggers's trial. Furthermore, her vague allegations that her husband had key information to use in the defense of Eggers, which Nemann ignored at the last hour, are insufficient to demonstrate ineffective assistance of counsel. Assuming the truthfulness of the contents of Dugan's affidavit, we conclude that the affidavit does not contain sufficient operative facts to demonstrate the lack of competent counsel and that the defense was prejudiced by counsel's ineffectiveness, or that Eggers's guilty plea was coerced or less than knowingly, voluntarily, and intelligently made.

[*P34]  Overall, the affidavit evidence submitted with Eggers's petition for post-conviction relief is largely conclusory and often self-contradictory. Moreover, many of the statements in the affidavits are based on opinions rather than objective facts gleaned from personal knowledge. We conclude that even if we assume the truthfulness of the allegations contained in the affidavits, Eggers has failed to satisfy his burden pursuant to R.C. 2953.21.

## C. The Non-Affidavit Documents Submitted with Eggers's Petition Do Not Contain Sufficient Operative Facts to Demonstrate Ineffective Assistance of Counsel

[*P35]  Eggers submitted numerous other exhibits with his petition for post-conviction relief. These exhibits consisted of text

messages; phone records; pictures; letters from his trial counsel;
the transcripts from police interviews with Eggers, Brad Locher,
and other potential witnesses; a report from a polygraph of Locher;
property receipts from the Springfield Police Department; Locher's
criminal history; a gun-shot-residue test showing gun-shot residue
on samples from Eggers; an inmate visitor log report; legal
invoices from his trial counsel; and articles from the internet
relating to gun-shot residue.

[*P36] We have reviewed all of the exhibits attached to Eggers's
petition for post-conviction relief. Many of the exhibits contain
information that would be damaging to Eggers's defense. It is clear
that Nemann relayed the damaging nature of this evidence to
Eggers. We are unpersuaded by Eggers's contentions that the
exhibits he submitted with his petition for post-conviction relief
establish his innocence, demonstrate ineffective assistance of
counsel, and prove that his guilty plea was less than knowing,
intelligent, and voluntary. Eggers's petition fails to contain
sufficient operative facts to demonstrate ineffective assistance of
counsel or require the trial court to hold an evidentiary hearing.

[*P37] Eggers's First, Second, Third, Fourth, Fifth, and Sixth
Assignments of Error are overruled.

*State v. Eggers PC, supra.*

The governing standard for ineffective assistance of counsel is found in *Strickland v.*

*Washington*, 466 U.S. 668 (1984):

A convicted defendant's claim that counsel's assistance was so
defective as to require reversal of a conviction or death sentence
has two components. First, the defendant must show that counsel's
performance was deficient. This requires showing that counsel
was not functioning as the "counsel" guaranteed the defendant by
the Sixth Amendment. Second, the defendant must show that the
deficient performance prejudiced the defense. This requires
showing that counsel's errors were so serious as to deprive the
defendant of a fair trial, a trial whose result is reliable. Unless a
defendant makes both showings, it cannot be said that the
conviction or death sentence resulted from a breakdown in the
adversary process that renders the result unreliable.

466 U.S. at 687.

With respect to the first prong of the *Strickland* test, the Supreme Court has commanded:

> Judicial scrutiny of counsel's performance must be highly deferential. . . .  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

466 U.S. at 689.

As to the second prong, the Supreme Court held:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to overcome confidence in the outcome.

466 U.S. at 694.  *See also Darden v. Wainwright*, 477 U.S. 168 (1986); *Wong v. Money,* 142 F.3d 313, 319 (6th Cir. 1998); *Blackburn v. Foltz*, 828 F.2d 1177 (6th Cir. 1987).  *See generally* Annotation, 26 ALR Fed 218.

Because the Second District Court of Appeals decided the ineffective assistance of trial counsel claim on the merits, Eggers' burden in habeas is to show that the decision is contrary to or an objectively unreasonable application of clearly established United States Supreme Court precedent.  *Williams v. Taylor, supra.*

Eggers acknowledges that *Strickland* provides the standard and has been particularly applied to the guilty plea context by *Hill v. Lockhart*, 474 U.S. 52, 57 (1985)(Corrected Brief, Doc. No. 14, PageID 910).  He asserts that the "state court's finding that counsel was effective is not entitled to a presumption of correctness."  *Id.*  at PageID 911, citing *Blackburn v. Foltz,* 828

27

F.2d 1177, 1181 (6th Cir. 1987).   However, *Blackburn* was decided before the deferential standard of 28 U.S.C. § 2254(d) was adopted in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.*, at 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674; *Lindh* v. *Murphy*, 521 U.S. 320, 333, n. 7, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at ___, 129 S. Ct. 1411, 173 L. Ed. 2d 251. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ___, 129 S. Ct. 1411, 173 L. Ed. 2d 251. Federal habeas courts must guard  against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington v. Richter*, 562 U.S. 86, 105 (2011).

Eggers cites a number of cases in which trial counsel failed to conduct an adequate investigation and thereby prejudiced the case (Corrected Brief, Doc. No. 14, PageID 911-15). He then argues the application of that precedent to this case. *Id.*  at PageID 915-16.

This argument is flawed in two essential ways.  First of all, Eggers treats as proven the facts on which he relies.  But his evidence is all uncross-examined hearsay.  The Second District notes that it is "largely conclusory and often self-contradictory.  *State v. Eggers PC, supra,* at ¶ 34.  It also found much of the non-affidavit evidence "damaging to Eggers's defense." *Id.*  at ¶ 36.  Eggers Corrected Brief does not attempt to deal with any of the damaging portions of that evidence, but assumes the Ohio courts and this Court are bound to accept as true the portions of the evidence most favorable to his case.

Secondly, Eggers has failed to show prejudice.  For example, he complains that Nemann

did not file a promised motion to suppress the gunshot residue test which showed he had fire a gun the same day as the murder. But filing such a motion does not mean it would have or should have been granted. Residue on his hands and not on the hands of the man he says did the shooting, Ray Locher, would have been pretty convincing to a jury. There is no suggestion of any basis on which it could have been suppressed.

In sum, Eggers has not demonstrated the Second District's conclusion on his ineffective assistance of trial counsel claim was unreasonable on either the facts or the law. The Second Ground for Relief should be dismissed.

June 1, 2015.

s/ *Michael R. Merz*
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 153-55 (1985).